Filed 8/15/23  In re Nathen R. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re NATHEN R. et al., Persons Coming Under the Juvenile Court Law. | B325066 (Los Angeles County Super. Ct. No. 20CCJP04635A-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>M.R. et al.,<br><br>        Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County.  Lisa A. Brackelmanns, Judge Pro Tempore.  Affirmed.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant M.R.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant A.B.

David Michael Miller, Deputy County Counsel; Tarkian & Associates and Arezoo Pichvai for Plaintiff and Respondent.

_____

M.R. (mother) and A.B. (father) appeal from the juvenile court's orders terminating their parental rights over Nathen R. (Nathen, born June 2012), Darlene B. (Darlene, born Dec. 2017) and Leilanee B. (Leilanee, born Oct. 2019).[1] (Welf. & Inst. Code, § 366.26.)[2] Both parents argue that the juvenile court erred when it found that the beneficial parental exception to the termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)) did not apply. In addition, father contends that the trial court erred in denying his request for a bonding study.

We affirm.

---

[1] Father is Darlene and Leilanee's father; Nathen's father, K.R., is deceased. Thus, while mother is challenging the termination of her parental rights as to all three children, father's appeal only concerns Darlene and Leilanee.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

# FACTUAL[3] AND PROCEDURAL BACKGROUND

*Referral and investigation*

On July 19, 2020, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging general neglect of the three children by mother and father. According to the referral, on July 18, 2020, mother, father, and the children attended a family gathering at the maternal grandparents' home. Father became intoxicated and attempted to drive the car. Mother pulled father out of the driver's seat, and he punched mother's face twice. The children were present during the incident. Mother's family called the police, and father was arrested for domestic battery. Mother refused to file for a restraining order.

### Initial interview with mother

On July 28, 2020, the investigating social worker visited the family home. Mother stated that the children were not present during the incident and did not see what occurred. She reported that father had been intoxicated to the point where he did not recognize her. When father hit her, she screamed, and her family came out of the house and called the police. Mother denied that the children were exposed to any form of domestic violence. She admitted to using marijuana.

### Interview with Nathen and paternal relatives

On July 30, 2020, the social worker interviewed Nathen, his paternal grandmother, and his paternal uncle, Byron R. (Byron). Byron reported that from the time Nathen's father passed away, Nathen stayed with him and the paternal

---

[3] Because mother and father's appeals focus on the parental-benefit exception to the termination of parental rights, we largely limit our summary of the facts to those that pertain to that issue.

3

grandmother, who lived at the same residence, every weekend, and since the inception of the COVID-19 pandemic, Nathen lived with them.

*Section 300 petition and detention (Sept. 3 & 8, 2020)*

On September 3, 2020, DCFS filed a petition pursuant to section 300, subdivisions (a) and (b), on behalf of the three children. The petition alleged that mother and father had a history of domestic violence and substance abuse, and that both parents were current users of drugs or alcohol.

The juvenile court detained the children[4] and granted the parents monitored visits.

*Jurisdiction/disposition report (Jan. 11, 2021)*

On December 28, 2020, Nathen reported that he liked living with his paternal relatives and had called Byron "'daddy'" since he was a baby. Nathen missed mother, but "'when it was just her and my sisters. With nobody else. Just me and her and my sisters. I really miss them.'"

Nathen was scheduled to have visits with mother three days a week. Byron reported that mother was inconsistent in visiting the child and only participated in the visits "'less than 50% of the time.'" The previous week, mother did not attend any of the visits, and the week before that, she only attended one visit.

Guadalupe reported that mother and father each had three visits a week and did not visit the girls together. She did not have any concerns regarding their interactions with the children and stated, "'The little girls really do like them.'" Mother and

---

[4] Nathen was placed with Byron. Darlene and Leilanee were placed with Guadalupe R. (Guadalupe), mother's cousin.

father's visits were not consistent. They did not visit the children during that week and had visited only one time the week before.

*Adjudication hearing (Jan. 11, 2021)*

On January 11, 2021, the juvenile court sustained the section 300 petition and declared the children dependents of the court. It granted mother and father family reunification services and monitored visits six hours a week.

*Status review report (July 12, 2021)*

DCFS reported that the children had adjusted well to the homes of their caregivers.

Byron and Guadalupe reported that mother and father were inconsistent in visiting the children. Sometimes the parents did not call or visit; other times, the visits were short and the parents were not engaged (although father was more engaged with the children than mother).

*Six-month review hearing (Aug. 10, 2021)*

The juvenile court found that the parents had partially complied with the case plan, and ordered family reunification services to continue.

*Status review report (Nov. 8, 2021)*

Byron reported that mother continued to cancel one or two visits a week. When she did visit Nathen, she attended the visit for a little over an hour. Nathen became emotionally affected when mother failed to show up for the scheduled visits. Byron reported that two weeks prior, mother canceled a visit with Nathen because her sister bought her a ticket to go to an amusement park. Byron opined that mother did not make the visits with Nathen a priority.

Guadalupe reported that mother was visiting Darlene and Leilanee more often, although her visits continued to be short in

duration. Father also had been more consistent with his visits and continued to engage well with the girls. In October 2021, mother and father paid for Leilanee's birthday celebration at Chuck E. Cheese restaurant.

Guadalupe stated she was afraid to report things to the social worker because she received backlash from her family. The maternal grandmother told Guadalupe that her reports to the social worker were the reason mother was not getting the children back. Father was also upset with Guadalupe and told her that she "*shouldn't be reporting things to [the social worker] of what mother does or doesn't do during visits with the girls because she is family and you don't go against family.*"

*Last minute information for the court (Jan. 19, 2022)*

Guadalupe reported that mother again was inconsistent with her visits with Darlene and Leilanee. She would have virtual visits with the girls sporadically for five minutes or less. Father had visited Darlene and Leilanee eight times a month.

*12-month review hearing (§ 366.21, subd. (f); Feb. 1, 2022)*

The juvenile court found that mother's and father's participation with the case plan had not been substantial, and terminated family reunification services.

*Section 366.26 report and addendum report (May 31, 2022)*

On March 17, 2022, the social worker learned that father had been under the influence of a substance and got into a car accident. Mother reported that she was without a car and thus had to cancel visits with the children. Father participated in virtual visits during that time.

DCFS reported that Byron and paternal grandmother wished to provide a permanent home for Nathen through adoption. The social worker observed Nathen to be comfortable

and happy in his caregivers' home. Nathen reported, "'Daddy takes good care of me, and feeds me.'" He added, "'Mamita does a very good job taking care of me.'"

Guadalupe was interested in adopting Darlene and Leilanee because she and her family loved them. The social worker observed the children to be comfortable in Guadalupe's home.

On May 16, 2022, Guadalupe reported that during the last week, mother only visited Darlene and Leilanee one time, on May 12, 2022. Father had visited the children twice a week.

Byron reported that during mother's in-person and telephone visits, Nathen suffered because mother asked closed-ended questions and did not keep the conversation going. Byron stated, "Nathen sometimes becomes upset when mother tells him [she] has visited his sisters because it is a reminder to him (Nathen) that she is able to make time and visit them but not him."

*Status review report (Aug. 8, 2022)*

On June 23, 2022, Guadalupe reported that mother had visited Darlene and Leilanee only once that week. When Guadalupe told mother that she should visit the girls more often, mother responded that Guadalupe should stop telling the social worker that she (mother) was not visiting the children, and instead, to tell the social worker mother did visit them.

Father visited the children twice that week.

On July 7, 2022, Nathen reported that during a visit with mother on July 5, 2022, she stated that she had not visited Darlene and Leilanee for three weeks. Byron reported that mother continued to ask Nathen a few questions and then began

to talk about herself.  Mother also did not take initiative during the visits.

*Permanency planning hearing (Aug. 8, 2022)*

The juvenile court continued the section 366.26 hearing and ordered DCFS to file a report addressing the quality and frequency of mother's and father's visits with the children.

*Last minute information for the court (Aug. 25, 2022)*

As of August 8, 2022, mother had had virtual and telephone visits with Nathen.  She was to resume in-person visits on August 25, 2022.  She expected to visit Nathen three days a week for three hours each visit.  Mother visited Darlene and Leilanee on August 18 and August 19, 2022, for approximately one hour.  Mother sat with the children during the visit but did not really engage with them.

Guadalupe reported that father visited Darlene and Leilanee two times a week for approximately one hour.  He brought the children food and engaged in play with them.

*Permanency planning hearing (Aug. 31, 2022)*

On August 31, 2022, the juvenile court continued the section 366.26 hearing and ordered DCFS to prepare a report addressing mother's and father's visits with the children.

*Last minute information for the court (Sept. 23, 2022)*

On September 15, 2022, Byron reported that mother missed visits with Nathen on September 13 and September 14, 2022, because she had a toothache.  On September 16, 2022, mother visited Nathen, and the visit went well.  During the week of September 19, 2022, mother visited Nathen three times for one-and-a-half hours.  Mother brought board games to visits and watched movies with the child.

On September 22, 2022, Guadalupe reported that mother and father were visiting Darlene and Leilanee more often. Father had visited the children three times a week for one-and-a-half hours. During the visits, he would engage in play and take the girls and Guadalupe to a liquor store to purchase snacks for them. Mother missed visits with the children on September 16 and September 21, 2022, because she was having pain from kidney stones. Mother did not attend all three visits a week. She visited Darlene and Leilanee two days a week. During one visit with the children, mother brought Darlene a bicycle, but did not bring anything for Leilanee. Mother engaged more with the children during the recent visits, but still did not assist with bathing or cooking.

*Permanency planning hearing (Oct. 4, 2022)*

<u>Byron's testimony</u>

Nathen had lived with Byron for two years and he wished to adopt the child. He wanted Nathen to have a relationship with Darlene and Leilanee.

Mother visited Nathen in his home. Nathen enjoyed the visits, had a bond with mother, and called her "mommy." When asked how often mother visited Nathen in September 2022, Byron stated, "[T]he visits last about an hour, maybe two hours. And the month specifically of September, she has been on top of her visits. So she's gone all three days. But there is a lot of inconsistency from visits." During the visits, mother and Nathen played board games, watched television, or played outside. She did not help Nathen with homework and rarely brought him food. Nathen was disappointed when mother missed visits. When mother missed visits with Nathen, they spoke telephonically, but the communication was very short.

9

<u>Guadalupe's testimony</u>

Guadalupe testified the siblings had regular visits, and if they could not have a visit, Guadalupe and Byron would schedule a makeup visit.

<u>Father requests a bonding study</u>

Father's counsel requested that the juvenile court order a bonding study for father and the girls, arguing the information as to the quality of father's visits in the last minute information for the court reports had been from Guadalupe and not from the social worker's own observations. The juvenile court denied father's request, stating: "I'm not going to order a bonding study at this time, but you certainly can make whatever argument you're going to make at the [section 366.26] hearing."

<u>Continuance of the section 366.26 hearing</u>

The juvenile court ordered DCFS to "[p]rovide a detailed update as to the status of sibling visits, Mother's visits, the quality of Father's visits and consortium issues." The hearing was continued.

*Last minute information for the court (Oct. 25, 2022)*

On October 14, 2022, Guadalupe and Byron signed a sibling contact agreement. Guadalupe also signed a contact agreement for visits between the girls and mother.

On October 18, 2022, Guadalupe informed the social worker that mother told their family that she was going to lose her children because of everything Guadalupe reported to DCFS. Furthermore, during the last visit, father threatened to sue Guadalupe and DCFS if his parental rights were terminated. Father told Guadalupe that she should not have said anything against her family. Guadalupe did not want to give up on the

10

girls because she loved them, but mother and father were being very difficult with her.

On October 25, 2022, Guadalupe reported that she was "exhausted from the treatment she continue[d] to receive from the parents, including extended family members . . . . However, she remain[ed] committed in moving forward with the plan of adoption, as she [was] invested in the girls having a stable and loving home."

*Last minute information report (Oct. 25, 2022)*

DCFS detailed mother's and father's visits with the children during October 2022.

<u>Father's visits with Darlene and Leilanee</u>

On October 5, 2022, father visited Darlene and Leilanee, and they played outside with their toys. On October 6, 2022, father visited the girls, brought them cheese pizza, played with them, and took them to the store for snacks. On October 7, 2022, father brought the girls food. On October 12, 2022, father visited Darlene and Leilanee and again brought food for the girls. On October 13, 2022, father did not show up for the visit or call to cancel. On October 14, 2022, father did not show up for the visit with the girls. On October 19, 2022, father participated in a visit with the children.

<u>Mother's visits with Nathen</u>

Mother failed to show up for the visit on October 4, 2022, despite texting Byron to see if the visit was going to take place. On October 5, 2022, mother contacted Byron and reported that she had a cough and was congested; she did not attend the visit that day. On October 6, 2022, mother did not attend the visit because she continued to be sick. On October 11 and 12, 2022, mother resumed in-person visits with Nathen, and the visits

11

went well.  On October 13, 2022, mother cancelled the visit with Nathen stating she had to work.  On October 18, 2022, mother attended a visit with Nathen.  Mother and Nathen played and watched television.  While they were watching television, mother asked Nathen to sit closer to her, and when Nathen said, "'No,'" mother responded, "'You're still my kid!  You need to sit next to me!'"  Byron said that mother made Nathen uncomfortable and did not respect his space.  On October 19, 2022, mother cancelled the visit.  On October 20, 2022, mother attended the visit and played with the child.

Mother's visits with Darlene and Leilanee

Mother failed to attend the visits on October 5, 6, and 7, 2022, because she was sick.  On October 12, 2022, mother did not attend the visit or call to cancel.  On October 13, 2022, mother attended the visit and played with the children.  During a visit on October 14, 2022, mother brought food for them to eat  On October 19, 2022, mother did not show up to the visit or call to cancel.  On October 20, 2022, mother visited the children, and the visit went well.

*Continued section 366.26 hearing (Oct. 26, 2022)*

Guadalupe's testimony

Guadalupe testified that mother visited Darlene and Leilanee at her home one or two times a week.  Mother was bonded with the children "80 percent of the time," and spent the other 20 percent talking to the family members that were at the visit.  The children called mother, "Mommy," and they enjoyed visits with her.  Mother played with the children, and in the two years the children lived with Guadalupe, mother had fed them three or four times.  Mother sometimes changed their diapers or underwear.

12

She did not know that if she adopted Darlene and Leilanee, parental rights would be terminated. She stated, "Well, they kind of explained it to me at the beginning when they barely started for the adoption, but other than that, that's been it." When asked if she was considering legal guardianship or adoption, Guadalupe responded, "Whatever is best for the girls." When asked what she thought was best for Darlene and Leilanee, Guadalupe stated, "I would want my cousin to get her kids back, and I been talking to her about that. So if it—if the court's gonna give them back to her or thinking about it, I would be the legal guardianship."

Father visited the girls two days a week. Darlene and Leilanee were excited to see him, they loved him, and they called him, "Daddy." Guadalupe testified: "Dad is a little bit more engaged with the girls. He does play with them more, takes them food sometimes." Darlene and Leilanee stated that they missed their parents, but they did not request to go home with father. Guadalupe opined that father should have the opportunity to be reunited with the children. Once Guadalupe adopted Darlene and Leilanee, she would allow father to continue visiting them.

When asked if she felt pressure from mother to pursue legal guardianship over adoption, Guadalupe stated: "[A] little bit. But I understand her as a mother that she wants her kids back, and I—that's the first thing I did, get her daughters to help her out. So I'm still here trying to help her." Guadalupe testified the children lived with her for two years and did well in her care. Further, if she did adopt Darlene and Leilanee, Guadalupe would ensure that mother and father continued to have visits with them.

13

<u>Father's testimony</u>

Father testified that he visited Darlene and Leilanee two times a week for two hours, but he did his best to visit them three times a week. The girls called him "dad" and were always excited to see him. They would jump around and say, "Daddy's home" or "Daddy's here." Father had a bond with Darlene and Leilanee. During visits, he brought them food, asked them about their days, and played with them. The girls said they wanted to go home with him on multiple occasions. Father testified that the social worker had never observed his visits with the children because he would visit after hours.

<u>Court order</u>

At the conclusion of the hearing, the juvenile court noted that it was unclear whether Guadalupe wished to care for the children under a plan of adoption or legal guardianship. Thus, it ordered DCFS to reinterview Guadalupe.

The hearing was continued.

*Addendum report (Nov. 15, 2022)*

On November 3, 2022, Guadalupe reported she was still being harassed by mother and father to change the permanent plan from adoption to legal guardianship. Despite pressure from mother and father, Guadalupe indicated that her preference was to adopt Darlene and Leilanee, but if she could not adopt them, she was willing to proceed with legal guardianship.

*Continued section 366.26 hearing (Nov. 15, 2022)*

DCFS's and the children's counsel requested that the juvenile court terminate parental rights. The children's attorney argued that mother's visits with Nathen were inconsistent. Further, while Nathen was bonded with mother, "the stability that Nathen has found with the person that he calls 'daddy' is

14

one that warrants the legal recognition of that, and that that permanency does outweigh the relationship that he does have with his mother."

Mother's visits with Darlene and Leilanee were equally inconsistent. Counsel stated that the girls had "just become bonded with [Guadalupe] in a parental sort of way at the beginning of the case. But they have been there for a great deal of time."

Mother's and father's attorneys requested that the juvenile court find the exception to termination of parental rights under section 366.26, subdivision (c)(1)(B)(i), applied.

Thereafter, the juvenile court issued its ruling. It first noted, "These cases are extremely difficult, and I do want to acknowledge that the parents of these children—the mother . . . and, the father . . . —clearly love these children. However, the court has to follow the law and . . . go through the various prongs of [*In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*).]"

The juvenile court continued, acknowledging that the children's relatives had "stepped up to the plate [and] have been caring for these children for over two years." Regarding the parents' visitation, the juvenile court found that mother's and father's visits with the children continued to be monitored and while at times, they were consistent, "overall, during the pendency of this case, they have not."

The juvenile court then stated that there was a "substantial positive bond between the children and their parents, but, as noted—and I'm fully adopting the arguments of [the children's trial counsel]—the benefit accruing to the children from their relationship with the parents is outweighed by the physical and emotional benefit the children will receive through the

15

permanency and stability of adoption with Nathen with his caregiver, the paternal uncle, who has stepped in as a father-figure for him since the passing of his biological father; and, for the girls, [with] their caregivers is outweighed by the physical and emotional benefit the children will receive through the permanency and stability of adoption, and that adoption is in the best interest of these children."

The juvenile court found that it was detrimental to the children to be returned to the parents and no exception to adoption applied. It then terminated mother's and father's parental rights.

*Appeals*

Mother and father's timely appeals ensued.

## DISCUSSION

Both mother and father argue that the juvenile court erred in finding that the parental-benefit exception to adoption did not apply. As part of his argument, father asserts that the juvenile court erred in denying his request for a bonding study.

I. *Termination of parental rights*

A. <u>Relevant law and standards of review</u>

Once the juvenile court terminates family reunification services, "the focus [of the proceedings] shifts to the needs of the child[ren] for permanency and stability." (*In re Celine R.* (2003) 31 Cal.4th 45, 52.) Under subdivision (c)(1)(B)(i) of section 366.26, if the juvenile court finds the children adoptable, it shall order a plan of adoption unless there is a compelling reason such as when the parents show that they "have maintained regular visitation and contact with the child[ren] and the child[ren] would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

16

To establish this exception, the parent must prove the following three elements: "(1) *regular visitation and contact*, and (2) a *relationship*, the continuation of which would benefit the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) The burden is on the parents to prove that termination of parental rights would be detrimental to the children. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351, overruled in part on other grounds in *Caden C.*, *supra*, 11 Cal.5th at p. 636, fn. 5; *In re Derek W.* (1999) 73 Cal.App.4th 823, 826–827; *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343–1345.)

"[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) "'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Id.* at p. 633.) The "'statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Caden C.*, at p. 631.)

When reviewing an order terminating parental rights and rejecting application of the beneficial parental relationship exception, we apply a hybrid standard of review. On the one hand, "[a] substantial evidence standard of review applies to the first two elements [of the exception]. The determination that the

17

parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.)

On the other hand, the juvenile court's determination on the third element is reviewed for an abuse of discretion. As to the third element, the juvenile court "makes the assessment by weighing the harm of losing the [parent-child] relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

"In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination."" [Citation.] But ""[w]hen two or more inferences can reasonably be deduced from the facts, the

18

reviewing court has no authority to substitute its decision for that of the trial court.""""" (*Caden C.*, at p. 641.)

"At its core," this hybrid standard of review "embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 641.

B. <u>Analysis</u>

Applying these legal principles, we conclude that the juvenile court did not err when it found that the parental-benefit exception did not apply.

1. *Inconsistent visits*

With respect to the first prong of the section 366.26, subdivision (c)(1)(B)(i), test, ample evidence supports the juvenile court's finding that mother's and father's visits were not consistent. At the detention hearing on September 8, 2020, the juvenile court granted mother and father monitored visits nine hours a week. At the inception of the case, Byron reported that mother was inconsistent in visiting Nathen and only participated in half of the visits. Guadalupe also reported that mother and father were not consistent in visiting the children.

Months later, in June and July 2021, mother and father continued to visit the children inconsistently. Byron reported mother would either cancel her visits or attend them "sporadic[ally]." She sent text messages to him stating she was not going to attend the visits because she did not feel well, or she had to attend her classes. Byron opined that mother did not treat

her visits with Nathen as a priority because she cancelled a visit with the child to go to an amusement park with her sister.

Guadalupe also reported that mother and father were inconsistent in their visits with Darlene and Leilanee. Father did not visit the girls in May or June 2021. He attended visits on July 28 and July 30, 2021, but he only stayed for approximately one hour and 10 minutes.

By October 2021, mother and father were attending visits with Darlene and Leilanee more frequently. However, by January 2022, mother's visits again were inconsistent.

The parents' inconsistency with visits continued into 2022. Mother either cancelled or missed visits with all three children in September and October 2022.

In October 2022, father also missed visits with his daughters.

At the section 366.26 hearing, Guadalupe testified that mother visited Darlene and Leilanee one or two times a week, and father visited the children two days a week. Father testified he visited Darlene and Leilanee two times a week for two hours but did his best to visit them three times a week.

Taken together, this evidence shows, as the juvenile court found, that the parents' visits were inconsistent. While father's visits with Darlene and Leilanee were more consistent than mother's, he also missed visits, and when he did attend the visits with the children, he did not stay for the entire allowed time. Periods of consistency simply are not enough. (See *In re C.F.* (2011) 193 Cal.App.4th 549, 554 ["Sporadic visitation is insufficient to satisfy the first prong of the parent-child relationship exception to adoption"]; see also *In re J.C.* (2014) 226 Cal.App.4th 503, 531 [regular visitation prong not present

when there were significant lapses in visitation]; *In re I.R.* (2014) 226 Cal.App.4th 201, 212 [significant lapses in visitation fatally undermines any attempt to finding beneficial relationship exception].)

Urging us to reverse, the parents argue that because the juvenile court found that there was a bond between the children and their parents, it could not find the parents' visits inconsistent.  There are at least two problems with this argument.  First, the parents offer no legal authority in support of this proposition.[5]  (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)  Second, based upon the evidence presented, the juvenile court properly determined that these two factors were not mutually exclusive.

2. *Benefit from continuing the relationship*

As to the second requirement of whether the parents and children had such a relationship that the children would benefit from continuing it,[6] we must focus on the children.  (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  "And the relationship may be

---

[5]     Father's reliance upon *In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1163, is misplaced.  In that case, the Court of Appeal considered "a novel question regarding which party bore the burden of proof at the section 364 review hearing."  (*In re Aurora P.*, *supra*, at p. 1153.)  Likewise, mother's argument notwithstanding, nothing in *Caden C.*, *supra*, 11 Cal.5th at page 632 supports the parents' proposition.

[6]     In discussing this second prong, our Supreme Court noted that expert observations, such as through a bonding report, can be "an important source of information about the psychological importance of the relationship for the child[ren]."  (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

shaped by a slew of factors, such as '[t]he age of the child[ren], the portion of the child[ren's] life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child[ren], and the child[ren's] particular needs.' [Citation.]" (*Caden C.*, *supra*, at p. 632.)

Mother argues that the juvenile court did not engage in a proper analysis of the second requirement. We disagree.

At the conclusion of the section 366.26 hearing, the juvenile court acknowledged a "substantial positive bond between the children and their parents." However, "the second element [of the beneficial parental relationship exception] is not, 'Is there a bond?' The question is whether [the children] had a 'substantial, positive, emotional attachment to the parent[s]—the kind of attachment implying that the child[ren] would benefit from continuing the relationship.' [Citation.]" (*In re M.V.* (2023) 87 Cal.App.5th 1155, 1185.) The parents did not make that showing here.

Nathen was already living out of mother's home prior to juvenile court intervention. Furthermore, Darlene was two years old and Leilanee was 10 months old at the time of their detention. They lived in Guadalupe's home for over two years during which time the parents maintained inconsistent visits. Therefore, even though the juvenile court found that there was a bond, the children's relationship with their parents was not the substantial, positive, emotional attachment to the parents that would imply the children would benefit from continuing the relationship. (*In re M.V.*, *supra*, 87 Cal.App.5th at p. 1185.)

22

3. *Whether termination would be detrimental to the children*

The third requirement of the beneficial parental relationship exception addresses whether the relationship between the parents and the children was such that termination of parental rights would be detrimental to Nathen, Darlene, and Leilanee. (*Caden C.*, *supra*, 11 Cal.5th at pp. 633, 640.) Here, the evidence supports the juvenile court's determination that termination of parental rights would not be detrimental to the children.

In assigning error, mother contends that "the court did not address whether [Nathen], Darlene, or Leilanee would suffer detriment by the termination of parental rights." Father similarly argues that the juvenile court found the benefits of adoption outweighed the bond the children had with father "without analysis . . . of the bond." These arguments fail. "[W]e are aware of no requirement . . . that the juvenile court, in finding the parental-benefit exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception." (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.) "To the contrary, we infer from section 366.26, subdivision (c)(1)(D)—under which the juvenile court is required to 'state its reasons in writing or on the record' when it makes a finding that termination of parental rights *would be* detrimental to the child—that the court is not required to make findings when it concludes that parental rights *would not be* detrimental." (*Ibid.*)

Mother next argues that Guadalupe "did not even know the full extent of what adoption meant," and thus the juvenile court should have considered legal guardianship. Contrary to mother's

23

argument, Guadalupe understood the difference between adoption and legal guardianship, and she consistently maintained she wished to adopt Darlene and Leilanee.  The adoptions social worker spoke with Guadalupe about concurrent planning, legal guardianship, and adoption, and Guadalupe stated that she wished to adopt Darlene and Leilanee because she and her family loved them.  Even though she was harassed by both parents, Guadalupe did not want to give up on the girls because she loved them.  In fact, "she remain[ed] committed in moving forward with the plan of adoption, as she [was] invested in the girls having a stable and loving home."

Finally, father argues that the juvenile court considered improper factors when it determined that the benefits of adoption outweighed the detriment the children would suffer if parental rights were terminated.  Specifically, father states that the juvenile court erred when it "criticized the parents for being unfit, for failing to reunify, and for not being in the parental role."

The juvenile court did not criticize the parents or state they did not stand in parental roles.  Rather, it was the children's counsel who argued that Darlene and Leilanee had become "bonded with [Guadalupe] in a parental sort of way."  While the juvenile court adopted the children's counsel's argument when it made its findings, it did not find that the parents did not stand in a parental role, and their failure to reunify did not influence the juvenile court's decision.[7]  Instead, in accordance with *Caden C.*,

_____

[7]     To the extent the juvenile court may have based its findings on the parents' failure to reunify with their children and/or not standing in parental roles, the parents did not suffer any prejudice.  (See *In re J.R.* (2022) 82 Cal.App.5th 526, 531 [the

24

*supra*, 11 Cal.5th at page 633, the juvenile court addressed mother's and father's visits; it found that the children's relatives had "stepped up to the plate" and cared for the children for over two years; it acknowledged that the parents shared a "substantial positive bond" with the children, but found that the benefit of maintaining their relationship to the parents was outweighed by the benefit they would receive through adoption; and the juvenile court found that it was detrimental for the children to be returned to the parents.

The cases cited by father—*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 208–212; *In re D.M.* (2021) 71 Cal.App.5th 261, 270; *In re J.D.* (2021) 70 Cal.App.5th 833, 865; and *In re B.D.* (2021) 66 Cal.App.5th 1218, 1230—do not compel a different result.

In *In re D.M.* and *In re J.D.*, unlike in this case, the social workers' reports gave the juvenile court little information about the quality of the children's visits with the parent and how they felt about them. (*In re D.M.*, *supra*, 71 Cal.App.5th at pp. 270–271; *In re J.D.*, *supra*, 70 Cal.App.5th at pp. 855, 860.) Also, in *In re D.M.*, the lower court expressly considered inappropriate factors when determining whether the exception to termination of parental rights existed. (*In re D.M.*, *supra*, at p. 270.)

In *In re J.D.*, *supra*, 70 Cal.App.5th at page 864 and *In re B.D.*, the appellate court could not determine whether the juvenile court relied upon improper factors when "balancing the harm of severing the natural parent-child relationship to the benefits of a new adoptive home in the crucial third step of the

mother was not prejudiced when the record would not support a finding in the mother's favor "even if her evidence were credited"].)

analysis." (*In re B.D.*, *supra*, 66 Cal.App.5th at p. 1230; see also *In re L.A.-O.*, *supra*, 73 Cal.App.5th at pp. 211–212 [because the trial court's ruling was "terse," the appellate court could not determine whether it relied upon inappropriate factors in terminating parental rights].) Here, as set forth above, we are able to determine that the juvenile court did not rely upon improper factors when it rejected the parents' contention that this exception to termination of parental rights applied.

In sum, there is no indication in the record that the juvenile court improperly relied on the parents' unfitness or whether they occupied parental roles. Rather, based upon all of the evidence, including father's testimony and the DCFS reports, which contained sufficient information about the quality of the children's visits with their parents, the juvenile court assessed the parents' visitation with the children, Nathen's relationship with mother, Darlene and Leilanee's relationship with mother and father, whether continuing the relationship would benefit the children, and lastly whether the children would be harmed by the termination of parental rights. There was no error.

## II. *Father's request for a bonding study*

In support of his contention that the juvenile court erred in terminating his parental rights, father challenges the juvenile court's order denying his request for a bonding study.

A. <u>The DCFS reports properly assessed father's visits and relationship with Darlene and Leilanee</u>

Father first argues that DCFS did not file a proper assessment of his relationship with Darlene and Leilanee and thus failed to comply with section 366.21, subdivision (i)(1)(B).

1. *Relevant law*

"Once a court sets a hearing pursuant to section 366.26 to select and implement a permanent plan for a dependent child, [DCFS] must prepare an assessment . . . , frequently referred to as an adoption assessment. Such an adoption assessment provides the information necessary for the juvenile court to determine whether it is likely the child will be adopted [citation] and to consequently order termination of parental rights." (*In re G.M.* (2010) 181 Cal.App.4th 552, 559.) As is relevant to this appeal, the assessment must include "[a] review of the amount of and nature of any contact between the child and [his or her] parents . . . since the time of placement." (§ 361.5, subd. (g)(1)(B); § 366.21, subd. (i)(1)(B); § 366.22, subd. (c)(1)(B); § 366.25, subd. (b)(1)(B).)

"[I]f the assessment is incomplete in some respects, the court will look to the totality of the evidence; deficiencies will go to the weight of the evidence and may ultimately prove insignificant. [Citation.] Substantial compliance with the assessment provisions has been deemed enough. [Citation.]" (*In re John F.* (1994) 27 Cal.App.4th 1365, 1378.)

2. *Analysis*

DCFS's reports in this case substantially complied with the statutory requirements, and any deficiencies in the assessments does not constitute prejudicial error. On February 1, 2022, the juvenile court terminated family reunification services and set the matter for a section 366.26 hearing. Thereafter, on May 16 and June 23, 2022, Guadalupe reported to the social worker that father visited the children two times a week.

On August 8, 2022, the juvenile court continued the section 366.26 hearing and ordered DCFS to file a report addressing the

quality and frequency of the parents' visits with the children. On August 25, 2022, the social worker prepared a report advising the juvenile court that father had visited Darlene and Leilanee two times a week for approximately one hour. During the visits, father brought food for the children and engaged in play with them.

On August 31, 2022, the juvenile court again continued the section 366.26 hearing and ordered DCFS to prepare another report addressing the parents' visits with the children.

In its September 23, 2022, report, DCFS advised the juvenile court regarding the parents' visits. Regarding father, the report indicated that he visited the children three days a week for one-and-a-half hours. During the visits, he would engage in play and take the girls and Guadalupe to a liquor store to purchase snacks.

In an October 25, 2022, report, DCFS listed father's visits with the girls for October. On October 5, 2022, father visited Darlene and Leilanee, and they played outside with their toys. On October 6, 2022, he visited the girls, brought them cheese pizza, played with them, and took them for snacks. On October 7, 2022, father brought food for the girls. On October 12, 2022, he visited Darlene and Leilanee and again brought them food. On October 13 and 14, 2022, father did not show up for the visit or call to cancel. On October 19, 2022, father participated in a visit with the children.

At the hearing on October 26, 2022, Guadalupe and father testified as to father's visits and relationship with Darlene and Leilanee.

Given the totality of the evidence, DCFS's reports were adequate and provided the juvenile court with sufficient

28

information regarding the amount and nature of contact between father and the girls.

B. <u>The juvenile court properly denied father's request for a bonding study</u>

Father next argues that a bonding study was essential for him to prove the parental-benefit exception to termination of parental rights.

1. *Relevant law*

At a section 366.26 hearing to select and implement a permanent plan for a child, "the primary issue often is whether the parents can establish that the child would benefit from a continuing relationship with them and that termination of parental rights would therefore be detrimental to the child. (§ 366.26, subd. (c)(1)(B)(i)." (*In re S.R.* (2009) 173 Cal.App.4th 864, 869.) "In attempting to establish or eliminate this exception to the preference for adoption, the parties or the court may require a bonding study to illuminate the intricacies of the parent-child bond so that the question of detriment to the child may be fully explored." (*Ibid.*)

"There is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to a termination order." (*In re Lorenzo C., supra*, 54 Cal.App.4th at p. 1339.)

The timing of the request is crucial. "Bonding studies after the termination of reunification services would frequently require delays in permanency planning. Similar requests to acquire additional evidence in support of a parent's claim under section 366.26, subdivision [(c)(1)(B)(i)] could be asserted in nearly every dependency proceeding where the parent has maintained some contact with the child. The Legislature did not contemplate such

29

last-minute efforts to put off permanent placement.  [Citation.]
While it is not beyond the juvenile court's discretion to order a
bonding study late in the process under compelling
circumstances, the denial of a belated request for such a study is
fully consistent with the scheme of the dependency statutes, and
with due process." (*In re Richard C.* (1998) 68 Cal.App.4th 1191,
1197, fn. omitted.)  "[A]t such a late stage in the proceedings [the
father's] right to develop further evidence regarding [his] bond
with the child was approaching the vanishing point." (*Id.* at
p. 1195.)[8]

We review a juvenile court's denial of a request for a
bonding study for abuse of discretion.  (*In re Lorenzo C.*, *supra*,
54 Cal.App.4th at p. 1341.)

2. *Analysis*

Applying these legal principles, we conclude that the
juvenile court did not abuse its discretion when it denied father's
request for a bonding study.  Aside from the fact that father's
request was made belatedly,[9] a bonding study was not required
because the DCFS reports contained sufficient information

---

[8]  In his reply brief, father asserts that *In re Richard C.* was
both wrongly decided and inconsistent with *Caden C.*  We
disagree.  As recently noted in *In re M.V., supra,* 87 Cal.App.5th
at p. 1182, it is "not an abuse of discretion to deny a belated
request for a bonding study that would delay a child's permanent
placement." (See also *In re M.M.* (2022) 81 Cal.App.5th 61, 68–
69, review granted on another issue, Oct. 12, 2022, S276099.)

[9]  As set forth above, father did not request the bonding study
until October 4, 2022, eight months after the juvenile court
terminated family reunification services and set the matter for a
section 366.26 hearing.

regarding father's visits and relationship with Darlene and Leilanee. While father argues that "[t]he quality of the visits between the girls and their father is wholly absent from any report", the DCFS reports sufficiently described the interactions between father, Darlene, and Leilanee and evaluated them positively. In addition, the juvenile court heard testimony from Guadalupe and father regarding his visits and relationship with the children.

Urging us to reverse, father cites *Caden C.*, *supra*, 11 Cal.5th at pages 632 through 633 for the proposition that courts should allow "expert testimony in termination of rights cases based on observation." However, nothing in *Caden C.* purported to restrict the broad discretion a juvenile court exercises over whether to order a bonding study. Even after *Caden C.*, a court that believes a bonding study is unnecessary because the record adequately reflects the nature of the relationship between a minor and his or her parent may still properly deny a request for a study. (*In re B.D.*, *supra*, 66 Cal.App.5th at p. 1228, fn. 3.)

Moreover, as set forth above, because father failed to demonstrate regular visitation and contact under the first prong of *Caden C.*'s test, any error in failing to order a bonding study to evaluate the second element (whether the child would benefit) does not require reversal of the finding that the exception did not apply. (See *Caden C.*, *supra*, 11 Cal.5th at pp. 632–633.)

Furthermore, also as set forth above, the juvenile court acknowledged a "substantial positive bond between the children and their parents." Because the juvenile court found a bond between father and the girls, there was clearly sufficient evidence in the DCFS reports about father's visits and relationship with

31

Darlene and Leilanee, and a bonding study would not have been useful to the court. And, because the case had been pending for over two years, the juvenile court was well-aware of the nature and extent of father's relationship with the girls, and thus properly denied his request for a bonding study.

*In re Amber M.* (2002) 103 Cal.App.4th 681 does not compel a different result. In that case, the evidence showed a "common theme running through the evidence from the bonding study psychologist, the therapists, and the [court appointed special advocate]" that there was a "beneficial parental relationship that clearly outweigh[ed] the benefit of adoption." (*Id*. at pp. 689–690.) The bonding study was important because the social worker "provided no more than a perfunctory evaluation" of the mother's relationship to the children. (*Id*. at p. 690.) In contrast, here, the DCFS reports provided detailed information on the parents' relationship with their children. In fact, those reports highlighted the positive aspects of father's relationship with his daughters—evidence echoed by father and Guadalupe's testimony.

Finally, father's reliance upon *In re Matthew P.* (1999) 71 Cal.App.4th 841 is misplaced. In that case, the Court of Appeal found that de facto and former foster parents (appellants) were denied due process when the juvenile court admitted social worker reports without allowing the appellants to cross-examine the social worker. (*Id*. at pp. 845, 849.) Here, father was not denied due process because the juvenile court held a full evidentiary hearing before terminating parental rights.

## DISPOSITION

The orders terminating parental rights are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
ASHMANN-GERST

We concur:

_____, P. J.
LUI

_____, J.
HOFFSTADT